# United States District Court

### EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| EMG TECHNOLOGY GROUP, LLC | § | |
| | § | |
| v. | § | **Cause No. 6:12-cv-543** |
| | § | **(Consolidated—Lead Case)** |
| THE VANGUARD GROUP, INC., et al. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This claim construction order construes the disputed claim terms of United States Patent No. 7,441,196. Plaintiff filed an opening brief (Doc. No. 138), Defendants filed a response (Doc. No. 140), and Plaintiff filed a reply (Doc. No. 142).[1] After consolidating Cause No. 6:13-cv-134 with this action, the Court allowed Defendant Autozone, Inc. to join in the claim construction positions Defendants briefed. Having considered the parties' arguments and the applicable law, the Court canceled the *Markman* hearing originally scheduled for December 11, 2013 in Tyler, Texas, and for the reasons that follow, the Court adopts the constructions set forth herein. A summary of the final constructions is included with this order as Attachment A.

---

[1]   References to docket numbers herein shall be to Case No. 6:12-CV-543 unless otherwise indicated.

# Table of Contents

I. BACKGROUND ................................................................................................ 3

II. LEGAL PRINCIPLES ................................................................................... 4

III. LEVEL OF ORDINARY SKILL IN THE ART .......................................... 7

IV. CONSTRUCTION OF DISPUTED TERMS ............................................. 8

    A. "manipulated within selected one of the regions" ................................... 8

    B. "email form" ............................................................................................. 8

    C. "purchasing interface" ............................................................................. 9

    D. "simplified navigation interface" ............................................................ 9

    E. "next deeper navigation layer" ............................................................. 14

    F. "exclusive to a separate single navigation option" ............................. 17

    G. "unique input" and "associated with a specific unique input" ........... 24

    H. "to navigate to the web page" ............................................................... 28

    I. "to navigate to the sister site" ............................................................... 32

    J. "to generate a sister site" ....................................................................... 33

    K. "reformatted" ......................................................................................... 39

    L. "the two-dimensional layer in a form of a navigation matrix" ............ 40

    M. "manipulating a region of the screen" and "manipulating a selected region of the screen" ................................................................................. 43

    N. "sister site" ............................................................................................. 48

    O. "webpage" and "web page" .................................................................. 48

V. CONCLUSION .............................................................................................. 49

## I. BACKGROUND

This is a patent infringement suit. Plaintiff alleges infringement of United States Patent No. 7,441,196 ("the '196 Patent") by Defendants The TJX Companies, Inc., J.C. Penney Corp., Inc., Coach, Inc., Williams-Sonoma, Inc., Pottery Barn Inc., Pottery Barn Teen Inc., Pottery Barn Kids Inc., West Elm, Inc., and Autozone, Inc.

The '196 Patent, titled "Apparatus and Method of Manipulating a Region on a Wireless Device Screen for Viewing, Zooming and Scrolling Internet Content," issued on October 21, 2008, and bears an earliest priority date of November 15, 1999. The '196 Patent has undergone reexamination at the United States Patent and Trademark Office ("PTO"), and a reexamination certificate issued on September 6, 2011. The Abstract of the '196 Patent states:

> A method and apparatus of simplified navigation. A web page is provided having a link to a sister site. The sister site facilitates simplified navigation. Pages from the sister site are served responsive to actuation of the sister site link. In one embodiment, the sister site includes matrix pages to permit matrix navigation.

The Court previously construed various terms in the '196 Patent in *EMG Technology, LLC v. Dr. Pepper Snapple Group Inc., et al.*, first in a provisional claim construction order (No. 6:10-CV-536, Doc. No. 296 (Apr. 3, 2012) (Davis, J.)), and then in a final claim construction order (No. 6:10-CV-536, Doc. No. 311, 2012 WL 3263588 (Aug. 8, 2012) (Davis, J.) ("*Dr. Pepper*")).[2] The Court also construed claims of the '196 Patent in *EMG Technology, LLC v. Chrysler Group, et al.*, No. 6:12-CV-259, Doc. No. 143, 2013 WL 3753562 (July 11, 2013) (Schneider, J.) ("*Chrysler*").[3]

---

[2]   The *Dr. Pepper* case settled approximately two months after the Court entered the final claim construction order (*see* 10/16/2012 Notice of Case Closure, No. 6:10-CV-536, Doc. No. 321). Citations to *Dr. Pepper* herein refer to the page numbering of the slip opinion.

[3]   The *Chrysler* case is ongoing and has not yet proceeded to trial (*see* No. 6:12-CV-259). Citations to *Chrysler* herein refer to the page numbering of the slip opinion.

## II. LEGAL PRINCIPLES

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The purpose of claim construction is to resolve the meanings and technical scope of claim terms. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). When the parties dispute the scope of a claim term, "it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

The claims of a patent define the scope of the invention. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). They provide the "metes and bounds" of the patentee's right to exclude. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). Accordingly, claim construction begins with and "remain[s] centered on the claim language itself." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

Claim terms are normally given their "ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Generally, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id* at 1313.

The best guide for defining a disputed term is a patent's intrinsic evidence. *Teleflex*, 299 F.3d at 1325. Intrinsic evidence includes the patent's specification and the prosecution history. *Id.*

The claims are part of the specification. *Markman*, 52 F.3d at 979. ."). "[T]he context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314; *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed Cir. 1997) ("[T]he language of

the claim frames and ultimately resolves all issues of claim interpretation."). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.

In addition to the claims, the specification's written description is an important consideration during the claim construction process. *Vitronics Corp.*, 90 F.3d at 1582. The written description provides further context for claim terms and may reflect a patentee's intent to limit the scope of the claims. *See Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Globetrotter Software, Inc. v. Elam Computer Grp., Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583).

But care must be taken to avoid unnecessarily reading limitations from the specification into the claims. *Teleflex*, 299 F.3d at 1326; *see also Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983) ("That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims."). "[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water*, 381 F.3d at 1117; *see also Phillips*, 415 F.3d at 1323

("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

The prosecution history is also part of the intrinsic evidence. *Phillips*, 415 F.3d at 1317. It "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* "As in the case of the specification, a patent applicant may define a term in prosecuting a patent." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004). Statements made during the prosecution of the patent may limit the scope of the claims. *Teleflex,* 299 F.3d at 1326; *see Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (explaining that the doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution").

Finally, the Court may rely on extrinsic evidence to aid with understanding the meaning of claim terms. *Markman*, 52 F.3d at 981. Extrinsic evidence includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 980. Extrinsic evidence is generally less useful or reliable, *Phillips*, 415 F.3d at 1317, and it should not be relied on when it contradicts the intrinsic evidence, *Markman*, 52 F.3d at 981.

Prior claim construction proceedings involving the same patents in suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006). The Court nonetheless conducts an independent evaluation during claim construction proceedings. *See, e.g., Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp.

2d 580, 589–90 (E.D. Tex. 2002); *Burns, Morris & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005); *Negotiated Data Solutions, Inc. v. Apple, Inc.*, No. 2:11–CV–390, 2012 WL 6494240 (E.D. Tex. Dec. 13, 2012).

### III. LEVEL OF ORDINARY SKILL IN THE ART

As a threshold matter, the parties dispute the level of skill of a person of ordinary skill in the art. The Court has a duty to resolve the dispute. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed."); *accord Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1478 (Fed. Cir. 1998) (Rader, C.J., concurring in part) (noting that "claim construction requires . . . assessment of the level of ordinary skill in the art").

Plaintiff proposes that "one of ordinary skill in the art in the 1999 time frame would have had a bachelor[']s degree in computer science or two years [of] experience with HTML programming and some basic knowledge of computer science" (Doc. No. 138 at 8).

Defendants propose that "one of ordinary skill in the art in the 1999 time frame would have had a master[']s degree in computer science or commensurate industry experience of at least four to five years of experience with HTML programming and general knowledge of Internet browser technology" (Doc. No. 140 at 4).

On balance, the Court finds that the level of ordinary skill in the art at the relevant time was a bachelor's degree in computer science or, alternatively, two years of experience with HTML programming.

# IV. CONSTRUCTION OF DISPUTED TERMS

## A. "manipulated within selected one of the regions"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain meaning | "manipulated within the region that is associated with a unique input" |

(Doc. No. 138 at 8).

Defendants submit that "[t]he construction of 'manipulated within selected one of the regions' was raised by a party that is no longer in this action, Motorola Mobility LLC, and is not disputed by the remaining Defendants" (Doc. No. 140 at 4 n.2).

The parties having thus reached agreement, the Court hereby construes **"manipulated within selected one of the regions"** to have its **plain meaning**.

## B. "email form"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain meaning | "a form that, when filled, transmits an email" |

(Doc. No. 113-1 at 1; Doc. No. 138 at 8). The parties submit that this term appears in Claims 36 and 72.

Defendants submit that "in the interest of limiting the number of claim terms the Court will need to address, Defendants will accept a construction of plain meaning for the term 'email form'" (Doc. No. 140 at 4 n.2). The parties' November 8, 2013 Joint Claim Construction Chart confirms this agreed construction (Doc. No. 149-2 at 2).

The parties having thus reached agreement, the Court hereby construes **"email form"** to have its **plain meaning**.

## C. "purchasing interface"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning | "purchasing form displayed in the navigation matrix" |

(Doc. No. 138 at 12; Doc. No. 140 at 4). The parties submit that this term appears in Claims 37 and 73.

In its reply brief, Plaintiff states that it "will agree with Defendants' proposed construction of 'purchas[ing] interface' as meaning a 'purchas[ing] form displayed in the navigation matrix" (Doc. No. 142 at 1 n.2). The parties' November 8, 2013 Joint Claim Construction Chart confirms this agreed construction (Doc. No. 149-2 at 2).

The parties having thus agreed upon a construction, the Court hereby construes **"purchasing interface"** to mean **"purchasing form displayed in the navigation matrix."**

## D. "simplified navigation interface"[4]

| Plaintiff's Proposed Construction | Defendant Coach's Proposed Construction |
|---|---|
| Plain meaning | "a navigation interface that cannot encompass 'links between pages' or 'prioritization' of content from a web page" |

(Doc. No. 138 at 12; Doc. No. 140 at 7). The parties submit that this term appears in Claims 25, 35, 36, 58, 71, and 72.

---

[4]   "Defendant Coach requests construction of this term. The Defendants, including Coach, believe the term 'simplified navigation interface' is indefinite . . . . Nevertheless, Coach contends that while the term is indefinite, it is at least clear from the prosecution history that the term must exclude standard navigation using links between pages and prioritization of content from a web page for the reasons discussed here" (Doc. No. 140 at 7 n.4). The disputed term "simplified navigation interface" is also the subject of Defendants' Motion for Summary Judgment of Invalidity for Indefiniteness (Doc. No. 144), which the Court addresses by a separate Memorandum Opinion and Order.

<u>(1) The Parties' Positions</u>

Plaintiff argues that "Defendants' attempt to define a term by stating what it does not mean will confuse the jury" and is "based on excerpts taken out of context from the prosecution history of related patent applications" (Doc. No. 138 at 14). Plaintiff urges that "[i]t would run contrary to th[e] plain language to say that a simplified navigation interface cannot encompass links between pages" (Doc. No. 138 at 15). As to the prosecution history, Plaintiff argues that it "distinguished the prior art on the basis that it lacked a sister site, i.e., a website separate from the standard site," and Plaintiff further argues that it "merely state[d] that prioritization is different from simplification" (Doc. No. 138 at 15–17).

Defendant Coach, Inc. ("Coach") responds that during prosecution, the patentee definitively stated that "links between pages" and "prioritization of content from a web page" are outside the scope of the claimed "simplified navigation interface." Coach cites *RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, 342 Fed. App'x 628 (Fed. Cir. 2009), as an example of a negative limitation. In *RFID Tracker*, the Court of Appeals for the Federal Circuit affirmed the district court's construction of the term "interrogator/reader" as meaning "an interrogator/reader that includes a field generator and a receiver, but not a transmitter." *Id.* at 629. The district court relied upon prosecution history that stated the "interrogator/reader" performs no transmission other than generating a radio frequency field for polling radio frequency identification (RFID) tags. *Id.* at 631–32. Coach has also noted that "an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) (quoting *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007)) (internal quotation marks omitted).

Plaintiff replies that Coach "contorts [Plaintiff's] straight-forward response to the examiner that merely having links between pages of a single website is not a sister site" (Doc. No. 142 at 1). Instead, Plaintiff argues, Plaintiff distinguished prior art as lacking a separate sister site (Doc. No. 142 at 2). As to "prioritization," Plaintiff replies that it "distinguished the prior art on the basis that it lacked a simplified navigation interface or one provided by a sister site. Merely having a web page on a single website that has less content is not the same as a separate website (i.e., sister site) having a simplified navigation interface" (Doc. No. 142 at 2–3). Finally, Plaintiff submits that "[i]f there is any disclaimer, it would be that a standard website that merely prioritizes content on one of its webpages does not disclose a sister site having a simplified navigation interface" (Doc. No. 142 at 3 n.4).

(2) Analysis

As to Coach's argument regarding "links between pages," the patentee stated during prosecution of United States Patent No. 7,020,845 ("the '845 Patent"):[5]

> [L]inks between individual webpages within a website do not constitute the accessing of sister sites or the association of a webpage with a sister site. Further, Appellants note that the standard manner in which a website is navigated is by using links between pages. *Arora* [(United States Patent No. 5,911,145)] simply provides an automated and organized manner for linking the webpages of a website to one another. This is not equivalent to providing simplified navigation, rather it is standard navigation.

(7/11/2003 Appeal Brief, Doc. No. 138-5 at 13; *see* 7/5/2005 Decision on Appeal, Doc. No. 140-7 at 12 ("[W]e agree with appellants (brief, pages 13 and 14) that having links to other web pages does not simplify the navigation of a web page, and that 'this simplified navigation, as characterized by the Examiner, is not provided by a sister site but is provided in the webpage itself.")). Coach argues that the patentee thereby "unmistakably distinguished 'simplified

---

[5]   The '196 Patent is a continuation of the '845 Patent.

navigation' from 'standard navigation,' which [Plaintiff] defined as 'links between pages' that provide 'an automated and organized manner for linking the webpages of a website to one another.' Thus, [Plaintiff] agreed and represented that 'simplified navigation' does not encompass 'links between pages,' which [Plaintiff] dismissed as 'standard' navigation" (Doc. No. 140 at 8).

A reasonable reading, however, is that the patentee criticized Arora *not* for using links between pages but rather for using a single website instead of a distinct sister site. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term."). On balance, the patentee made no definitive statements that would warrant precluding links from being part of a "simplified navigation interface." *See Omega Eng'g*, 334 F.3d at 1324 ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution." (emphasis added)). Moreover, the specification discloses examples of linking between pages as part of a simplified navigation interface. *See* '196 Patent at 8:24–9:25, 9:46–10:3, Figs. 2a, 2b, 10a–10g.

As to Coach's argument regarding "prioritization of content from a web page," Coach cites the prosecution of abandoned United States Patent Application No. 12/547,429.[6] The applicant responded to a rejection based on "Kanevsky," United States Patent No. 6,300,947:

> The cited section makes no mention of a "simplified navigation interface" or that such an interface is provided by a "sister site." Rather, the cited section discusses how a web page can have some of its content dropped when displayed on a

---

[6] United States Patent Application No. 12/547,429 was a continuation of a continuation of the '196 Patent. *See* United States Patent Application Publication No. 2010/0017295.

smaller display based on a prioritization scheme. See col. 11, lines 42–45 ("[p]rioritization depends on such factors as, for example, the importance of information contained in an object and/or how often this object (link) is visited by this particular user or all users"). Thus, the navigation is not simplified; rather, the navigation is prioritized. This could in fact render the navigation more complicated or less simple, due to low priority navigation options being dropped to fit a screen size. Dropping navigation options makes accessing dependent or linked content more difficult when the corresponding links are dropped.

(8/2/2011 Response to Office Action, Doc. No. 140-10 at 6).

A reasonable reading is that the patentee did not disclaim prioritization but rather merely criticized Kanevsky for dropping low priority navigation options instead of providing a distinct sister site. *See SanDisk*, 415 F.3d at 1287. On balance, the patentee made no definitive statements that would warrant precluding a "simplified navigation interface" from including "prioritization" of content from a web page. *See Omega Eng'g*, 334 F.3d at 1324. Moreover, one embodiment disclosed in the '196 Patent includes a "ranking system" for displaying, "in a user-friendly ranked order," only the highest-ranked products in a particular category. *See* '196 Patent at 8:56–9:2, Fig. 10e.

Coach's proposed construction is therefore hereby expressly rejected. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

The Court accordingly hereby construes **"simplified navigation interface"** to have its **plain meaning**.

**E. "next deeper navigation layer"[7]**

| Plaintiff's Proposed Construction | Defendant Coach's Proposed Construction |
| --- | --- |
| Plain meaning | "a more specific navigation layer from the plurality of layers" |

(Doc. No. 138 at 17; Doc. No. 140 at 12; Doc. No. 149-2 at 4). The parties submit that this term appears in Claims 25 and 58.

(1) The Parties' Positions

Plaintiff submits that "[a]ccording to the claim language, the next deeper layer is more specific than the layer that preceded it" (Doc. No. 138 at 17). Plaintiff argues that because Coach's proposed language "already is in the language of the claim," "[t]he addition of duplicative language only will serve to confuse a jury" (Doc. No. 138 at 18).

Coach responds that Plaintiff's argument actually supports Coach's proposal that "next deeper" means "more specific" and that there must be multiple layers (Doc. No. 140 at 12).

Plaintiff replies by reiterating that "the claim already includes the language . . . that Coach proposes to add" (Doc. No. 142 at 3).

(2) Analysis

Claim 58 is representative and recites (emphasis added; reexamination amendments included but not indicated):

58. A machine readable medium having instructions stored therein, which when executed cause a machine to perform a set of operations comprising:
displaying on-line content accessed via the Internet, the on-line content reformatted from a webpage in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site, the sister

---

[7]   "Defendant Coach requests construction of this term" (Doc. No. 140 at 12 n.5).

site including a portion or a whole of content of the web page reformatted to be displayed and navigable through a simplified navigation interface on any one of a television, web appliance, console device, handheld device, wireless device or cellular phone, the simplified navigation interface displayed in a form of a two-dimensional layer of cells from a *plurality of layers* and a plurality of cells, the two-dimensional layer in a form of a navigation matrix, each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input, the on-line content formatted to be displayed in one or more of the plurality of cells and formatted to be selected for navigation by one or more of the unique inputs, *navigation options to change between layers of the simplified navigation interface from general to more specific in each deeper layer;*

displaying a hyperlink on the sister site to navigate to the web page, or displaying a hyperlink on the web page to navigate to the sister site;

receiving a user selection of one of the navigation options;

forwarding the selected navigation option across the internet to a server providing the simplified navigation interface;

*receiving a next deeper navigation layer of the simplified navigation interface corresponding to the selected navigation option*; and

manipulating a region of the screen for viewing and zooming and/or scrolling of the displayed on-line content.

The specification also discloses "layers":

"Primary navigation options" as used herein are those navigation options that necessarily change between successive matrix layers, changing from general to more specific with increases in depth in the matrix.

'196 Patent at 7:46–49.

FIGS. 10*a*–*g* are a series of matrix layers displayed during an exemplary navigation using one embodiment of the invention. In this example, navigation begins at the Shopping and Products matrix layer and [*sic*] shown in FIG. 10*a*. A selection of 5 on the 10*a* matrix layer yields an Electronics matrix layer shown in FIG. 10*b*.

Selecting 1 on the keypad when the matrix layer of 10*b* is displayed yields the Audio matrix layer of FIG. 10*c*. By selecting an 8 on the keypad when 10*c* is displayed, the system displays a Receivers matrix layer of FIG. 10*d*, which breaks down receivers into price categories and also provides the option of navigating, in this embodiment, into Consumer Reports industry reports related to receivers.

*Id.* at 8:36–49.

During prosecution of related United States Patent Application No. 09/440,214, which issued as United States Patent No. 6,600,497 ("the '497 Patent"),[8] the patentee explained: "[T]he instant application defines a next deeper navigation matrix layer as a layer for which the primary navigation options are more specific than the layer above it." (7/16/2002 Amendment and Response to Office Action, Doc. No. 140-9 at 2). Also during that prosecution, the patentee stated:

> Additionally, responsive to the selection of a cell navigation matrix layer, a next deeper navigation matrix layer is generated on the display. In this manner, the user is able to drill down through successively more exact categories until the desired content page is reached at the maximum depth of that path through the navigation matrix . . . .

(1/7/2004 Appeal Brief, Doc. No. 140-10 at 5).

On balance, the prosecution history cited by Coach adds little, if anything, that is not already present in surrounding claim language, such as in Claim 58, quoted above. Instead, Coach's proposed construction would tend to confuse rather than clarify the scope of the claims. The Court therefore hereby expressly rejects Coach's proposed construction.

No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan*, 626 F.3d at 1207 ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

---

[8]   The '196 Patent is a continuation of a continuation-in-part of the '497 Patent.

The Court accordingly hereby construes **"next deeper navigation layer"** to have its **plain meaning**.

## F. "exclusive to a separate single navigation option"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "there is a one-to-one relationship between cells and navigation options"[9] |

(Doc. No. 138 at 18; Doc. No. 149-2 at 2). The parties submit that this term appears in Claims 25 and 58.

*Chrysler* construed this disputed term to mean "there is a one-to-one relationship between cells and navigation options." *Chrysler* at 10–17. The Court also held that its construction required "one-to-one correspondence in 'both directions.' That is, the Court's construction precludes 'one-to-many' correspondence and also precludes 'many-to-one' correspondence." *Chrysler* at 17.

### (1) The Parties' Positions

Plaintiff "maintains that this phrase does not require construction and disagrees that it should be interpreted to preclude the many-to-one correspondence, at least to the extent that Defendants interpret this to mean that two cells, each with its own navigation option, cannot lead to the same place" (Doc. No. 138 at 18). Plaintiff explains: "The plain meaning of the claim language states that each cell is exclusive (not shared) to a separate and single (not more than one) navigation option. In short, there is a one-to-one mapping such that each cell corresponds to a single navigation option" (Doc. No. 138 at 19). Plaintiff submits that "[f]or example, Figure 2B illustrates that two navigation options such as 'Favorites' and [']Shopping' can lead to the same

---

[9]   In their response brief, Defendants proposed: "'contains a single navigation option that is distinct from that of every other cell' but Defendants now support the Chrysler construction" (Doc. No. 140 at 13).

place" (Doc. No. 138 at 20). Plaintiff further urges that Defendants' proposal would improperly limit the claims to certain preferred embodiments and should therefore be rejected (Doc. No. 138 at 20).

Defendants respond that the Court should adopt the construction and analysis set forth in *Chrysler*, together with the clarifications set forth in *Chrysler* (Doc. No. 140 at 13–15).

Plaintiff replies that it "does not dispute the one-to-one correspondence between the cells and the navigation option, but maintains that the claim language captures this relationship" (Doc. No. 142 at 3). Plaintiff further argues that "[a]dopting a definition that itself requires clarification will foster confusion among the jury" (Doc. No. 142 at 4). Plaintiff concludes that because "[t]his is a case where the proposed construction does not improve upon the claim language and, in fact, introduces ambiguity where none existed before," "[t]his term should be given its plain meaning" (Doc. No. 142 at 4). Plaintiff nonetheless notes that it "would not oppose that in its Claim Construction Order, the Court makes clear that the plain meaning captures and requires the one-to-one correspondence between a cell and navigation option" (Doc. No. 142 at 4 n.5).

(2) Analysis

Claim 58 is representative and recites (emphasis added; reexamination amendments included but not indicated):

> 58. A machine readable medium having instructions stored therein, which when executed cause a machine to perform a set of operations comprising:
> displaying on-line content accessed via the Internet, the on-line content reformatted from a webpage in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site, the sister site including a portion or a whole of content of the web page reformatted to be displayed and navigable through a simplified navigation interface on any one of a television, web appliance, console device, handheld device, wireless device or cellular phone, the simplified navigation interface displayed in a form of a two-dimensional layer of cells from a plurality of layers and a plurality of cells, the two-dimensional layer in a form of a navigation matrix, *each cell is a division of a screen and exclusive to a separate single navigation option associated with a*

*specific unique input*, the on-line content formatted to be displayed in one or more of the plurality of cells and formatted to be selected for navigation by one or more of the unique inputs, navigation options to change between layers of the simplified navigation interface from general to more specific in each deeper layer;

　　　　displaying a hyperlink on the sister site to navigate to the web page, or displaying a hyperlink on the web page to navigate to the sister site;

　　　　receiving a user selection of one of the navigation options;

　　　　forwarding the selected navigation option across the internet to a server providing the simplified navigation interface;

　　　　receiving a next deeper navigation layer of the simplified navigation interface corresponding to the selected navigation option; and

　　　　manipulating a region of the screen for viewing and zooming and/or scrolling of the displayed on-line content.

The specification of the '196 Patent discusses navigation options but does not explicitly

define "exclusive" or "separate":

In the context of a matrix page, one suitable segmentation is by cell, e.g., each cell corresponds to a region that may be independently brought into focus. The borders of the regions may or may not be visible on the web pages displayed. This segmentation facilitates tab, scroll, and zoom features described in more detail below. Alternatively, segmentation may be performed as part of a custom browser on custom browser nodes or may be instantiated as a hardware or firmware solution within, for example, the set top box.

'196 Patent at 3:2–11.

If the page is not a matrix page, the page is segmented either based on area or content. By "segmentation," it is meant that the page is divided into a plurality of regions. The regions may contain one or more links and/or some amount of content. This segmentation facilitates usability as discussed in more detail below.

*Id.* at 4:58–64.

FIG. 8 is a diagram of the display of a graphical user interface of one embodiment of the invention. The screen is divided into a plurality of cells. In this embodiment, there are fifteen cells that represent navigation options and one messaging cell for displaying messages from the server, the progress or status bar, and a title block. The cells can further be subdivided between the digit keys 1–9 keys [*sic*] which, in this embodiment, represent the primary set of navigation options and the keys designated by letters A–C which represent secondary navigation options and *, 0, and # keys that may be additional navigation options or provide specialized functions. For example, the * key may return the user to the server home site, thereby leaving matrix navigation. The ABC cells will typically hold advertising, and selecting one of those cells will generate a matrix layer with

primary navigation cells directed to that advertiser or the product line being advertised. While the interface is designed to be fully accessible with minimal key strokes from a key pad, it is also within the scope and contemplation of the invention to permit selection with a mouse or other pointer device.

*Id.* at 7:65–8:17.

FIGS. 10*a*–*g* are a series of matrix layers displayed during an exemplary navigation using one embodiment of the invention. In this example, navigation begins at the Shopping and Products matrix layer and [*sic*] shown in FIG. 10*a*. A selection of 5 on the 10*a* matrix layer yields an Electronics matrix layer shown in FIG. 10*b*.

Selecting 1 on the keypad when the matrix layer of 10*b* is displayed yields the Audio matrix layer of FIG. 10*c*. By selecting an 8 on the keypad when l0*c* is displayed, the system displays a Receivers matrix layer of FIG. l0*d*, which breaks down receivers into price categories and also provides the option of navigating, in this embodiment, into Consumer Reports industry reports related to receivers. Notably, in FIG. 10*d*, the number of primary navigation options is reduced to 4. Thus, it is not necessary that all layers of the matrix have the same number of cells, nor is it required that all cells have the same size.

*Id.* at 8:37–53.

During reexamination of the '196 Patent, the patentee stated:

Additionally, Claim 1 is distinguishable over HTML 4.0 as the applied reference fails to disclose or suggest that "each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input." The Request identifies assigning an access key to an element, as described in HTML 4.0, as "a separate single navigation option associated with a specific unique input." However, *HTML 4.0 fails to disclose or suggest that an access key is unique to an element. In this regard, more than one access key can be assigned to the same element.* Therefore, HTML 4.0 fails to disclose or suggest that "each cell is a division of the screen and exclusive to a separate single navigation option associated with a specific unique input,["] as recited in Claim 1.

Accordingly, the '196 Patent holder submits that HTML 4.0 fails to disclose or suggest all the features of Claim 1.

(8/30/2010 Response to Office Action, Doc. No. 140-13 at 13 (emphasis added)).

The prosecution histories of related patents are also relevant to construction of the disputed term. *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007)

("When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue."); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003) ("[P]rosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications. . . . As long as the same claim limitation is at issue, prosecution disclaimer made on the same limitation in an ancestor application will attach.")

During prosecution of the '497 Patent,[10] the patentee stated:

> Even more significant is the utter absence in either of the [prior art] references of the user input device permitting a <u>unique input corresponding to each cell of a current two-dimensional layer of navigation matrix</u>. By way of example, although <u>Jones</u> [(United States Patent No. 6,199,098)] teaches that when a mouse is over one of the links and clicks thereon, it opens a node in the hierarchy[,] this fails to teach or suggest the unique input associated with each cell of a current two-dimensional layer of navigation matrix. Moreover, since a mouse click is still a mouse click, wherever it happens to occur, a mouse fails to provide the ability to supply the <u>unique inputs</u> as the term is used by Applicants. When unique inputs are used, traversal of the matrix may be independent of cursor position.

(7/9/2002 Response to Office Action, Doc. No. 140-9 at 3–4 (emphasis in original)).

During prosecution of United States Patent No. 7,194,698 ("the '698 Patent"),[11] an Interview Summary noted discussion regarding a "one to one mapping":

> The examiner and applicant discussed language for the claims to further describe that the navigation interface comprises a plurality of cells arranged in a grid-like structure having a *one to one mapping* unique to a key press and wherein data is automatically displayed based on a user's selection history log.

(4/28/2005 Interview Summary Doc. No. 140-14 (emphasis added)). Then, in remarks accompanying an amendment that added the phrase "unique inputs," the patentee explained that "[c]ontent that is formatted for navigation with unique inputs has a *one-to-one unique mapping*

---

[10] The '196 Patent is a continuation of a continuation-in-part of the '497 Patent.
[11] The '698 Patent is a divisional of the '497 Patent.

to an input." *Dr. Pepper* at 9 (quoting 5/27/2005 Amendment, No. 6:10-CV-536, Doc. No. 280-13 at 14) (emphasis as in *Dr. Pepper*). In *Dr. Pepper*, the Court considered this and related prosecution history and concluded that:

> [Plaintiff] did not clearly disavow touchscreens; rather, it defined and limited the simplified navigation interface of the original claim 39.
>
> [Plaintiff's] introduction of "unique inputs" to distinguish [the] Kaplan [reference] did make clear that unique inputs require a one-to-one mapping between the user input and the associated content. . . . Thus, there is a one-to-one mapping between a unique input and the content it is associated with. [Plaintiff's] proposed construction, which only requires "a single input that is sufficient to activate a single navigation option," fails to capture this one-to-one mapping. The input must activate "only one" navigation option.

*Dr. Pepper* at 9.

On balance, *Dr. Pepper* is persuasive because the above-quoted excerpts from the prosecution history contain definitive statements requiring a "one-to-one" relationship between the inputs and the content associated therewith. (*See, e.g.*, 8/30/2010 Response to Office Action, Doc. No. 140-13 at 13 ("HTML 4.0 fails to disclose or suggest that an access key is unique to an element. In this regard, more than one access key can be assigned to the same element.")); *Omega Eng.*, 334 F.3d at 1324 ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution." (emphasis added)).

Such an interpretation is also consistent with extrinsic dictionary definitions, submitted by Defendants, that define "exclusive" as meaning "[n]ot shared with others. Independent or single: sole" and that define "separate" as meaning "[e]xisting by itself: independent. Not alike: dissimilar." *Webster's II New College Dictionary* 391, 1007 (1995) (included with Defendants' briefing at Doc. No. 140-16). Defendants also submit another definition of "exclusive" as meaning "[n]ot divided or shared with others . . . Single or independent; sole." *American*

*Heritage Dictionary* 473 (Second College Edition 1985) (included with Defendants' briefing at Doc. No. 140-17). Although extrinsic dictionary definitions must be used with caution, such evidence is "among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Phillips*, 415 F.3d at 1318.

As to Defendants' statement that "[t]he Court also clarified [in *Chrysler*] that its construction . . . meant there could be no 'empty cells' that do not include a navigation option," the Court found in *Chrysler*:

> Plaintiff emphasized at the June 20, 2013 hearing that a matrix layer may contain "empty" cells, that is, cells for which there is no associated navigation option. *See, e.g.,* '196 Patent at Fig. 14. The claim language, however, recites that "each cell is a division of a screen and exclusive to a separate single navigation option." On balance, the claim language is plain that "each cell" is associated with a navigation option.

*Chrysler* at 16–17. The Court hereby adopts this finding from *Chrysler*.

The Court further hereby clarifies, as requested by the defendants at the June 20, 2013 hearing in *Chrysler* and as re-urged by Defendants in the above-captioned case (*see* Doc. No. 140 at 13), that the Court's construction requires one-to-one correspondence in "both directions." That is, the Court's construction precludes "one-to-many" correspondence and also precludes "many-to-one" correspondence because such correspondence would contradict the patentee's above-quoted reliance on "one-to-one mapping" and "one-to-one unique mapping." *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent.").

The Court therefore hereby construes **"exclusive to a s eparate single navigation option"** to mean **"there is a one-to-one relationship between cells and navigation options."**

**G. "unique input" and "associated with a specific unique input"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plaintiff proposes construing "unique input" to mean "a separate input that actuates only one navigation option" | Defendants propose construing "associated with a specific unique input" to mean "associated with a distinct input that actuates only one navigation option" |

(Doc. No. 138 at 21; Doc. No. 140 at 15). The parties submit that these terms appear in Claims 25 and 58.

Dr. Pepper construed "unique input" to mean "a separate input that actuates only one navigation option." *Dr. Pepper* at 7–10.

At the June 20, 2013 hearing in *Chrysler*, the Court preliminarily proposed construing "unique input" to mean "a separate input that actuates only one navigation option." Plaintiff was agreeable, but the defendants responded that the Court should substitute the word "distinct" for the word "separate" to clarify that each input is different from all other inputs. The Court also proposed construing "associated with a specific unique input" to have its plain meaning, and Plaintiff and the defendants had no objection.

*Chrysler* then adopted defendants' suggested modification, thereby construing "unique input" to mean "a distinct input that actuates only one navigation option." *Chrysler* at 21.

(1) The Parties' Positions

Plaintiff argues that "there is no basis for substituting 'distinct' for 'separate' in the Court's construction because 'separate' captures that 'each navigation option must be actuated by a different [or separate] input,' i.e, that no one input actuates more than one navigation option" (Doc. No. 138 at 21 (quoting *Chrysler* at 19)). Plaintiff further argues that "[t]he use of the word 'distinct' also is problematic because it will foster confusion with a jury about what it means for an input to be 'distinct'" (Doc. No. 138 at 21). Plaintiff continues that "nowhere in the

specification is the term 'distinct' used, i.e, does it mean different letters, numbers, numbers vs. letters? Similarly, the substitution of 'that' for 'one' also does not clarify the claim language" (Doc. No. 138 at 22).

Defendants respond that *Dr. Pepper* and *Chrysler* erred by finding that the patentee did not disavow coverage of a "touchscreen" as a "unique input" (Doc. No. 140 at 15 n.7). Otherwise, Defendants cite the analysis of *Chrysler* as support for requiring a "distinct" input (Doc. No. 140 at 15–16).

Plaintiff replies that "the plain and ordinary meaning of 'separate' captures, in the Court's words, that 'each navigation option must be actuated by a *different* input'" (Doc. No. 142 at 5 (quoting *Chrysler* at 19) (emphasis Plaintiff's)). Plaintiff also argues that "[t]he use of the word 'distinct' is not found in the specification or claims. It will create confusion with a jury about what it means for an input to be 'distinct.' For example, does it mean using different letters, different numbers, or numbers and letters, etc? Because Defendants' construction reflects a preference rather than improved clarity, EMG's construction should be adopted" (Doc. No. 142 at 5 n.7). Finally, Plaintiff argues that *Chrysler* properly rejected the defendants' argument that the patentee disclaimed touchscreens (Doc. No. 142 at 5).

(2) Analysis

As a preliminary matter, Defendants agree that the phrase "associated with a" requires no construction (*see* Doc. No. 140 at 15). The Court therefore construes only the term "unique input."

The term "unique input" raises the same underlying issues as the term "exclusive to a separate single navigation option," discussed above. The Court therefore reaches the same conclusions here. Further, the Court finds persuasive the findings in *Dr. Pepper* and *Chrysler*

that the patentee did not disclaim touchscreens. *Dr. Pepper* at 9–10 (finding that Plaintiff's "arguments that a mouse click is not a unique input d[id] not disavow touchscreens as unique inputs"); *Chrysler* at 19.

As to the proper construction, the constituent term "unique" does not appear in the specification, but Plaintiff has cited Figure 8 as "an example of using numbers, letters, or symbols on a keypad as specific unique inputs associated with a navigation option" (Doc. No. 138 at 22). Figure 8 is reproduced here:



FIG. 8

Plaintiff has also cited portions of the specification, which are reproduced here:

> The screen is divided into a plurality of cells. In this embodiment, there are fifteen cells that represent navigation options and one messaging cell for displaying messages from the server, the progress or status bar, and a title block. The cells can further be subdivided between the digit keys 1–9 keys [*sic*] which, in this embodiment, represent the primary set of navigation options and the keys designated by letters A–C which represent secondary navigation options and *, 0, and # keys that may be additional navigation options or provide specialized functions.
>
> * * *
>
> By selecting an 8 on the keypad when 10*c* is displayed, the system displays a Receivers matrix layer of FIG. 10*d*, which breaks down receivers into price categories and also provides the option of navigating, in this embodiment, into Consumer Reports industry reports related to receivers.

'196 Patent at 7:66–8:9, 8:44–49.

On balance, the Court finds that using the word "distinct" instead of "separate" in the Court's construction will better aid the finder of fact by emphasizing that each navigation option must be actuated by a different input. *See Funai Elec. Co., Ltd. v. Daewoo Elec. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention."). The Court therefore substantially adopts the *Dr. Pepper* construction of "unique input," but here as in *Chrysler*, the Court changes the word "separate" to "distinct." *Chrysler* at 19–20.

Finally, the Court hereby expressly adopts the finding in *Chrysler* rejecting the defendants' argument that a touch on a touchscreen constitutes the same "unique input" no matter where it occurs on a screen. *See id.* Instead, "buttons" on a touchscreen, for example, can constitute multiple "unique inputs" just as if they were physical hardware buttons, such as on a keypad. *See Dr. Pepper* at 9–10. The factual analysis of whether particular "inputs" are unique is a factual question for an infringement analysis rather than a legal question for claim construction. *See Markman*, 52 F.3d at 976 ("An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." (citation omitted)); *see also PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("[A]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact.").

The Court accordingly hereby construes **"unique input"** to mean **"a distinct input that actuates only one navigation option."**

**H. "to navigate to the web page"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "to navigate to the web page used to generate the sister site" |

(Doc. No. 138 at 23; Doc. No. 140 at 16). The parties submit that this term appears in Claims 25 and 58.

*Chrysler* construed this disputed term to mean "to navigate to the website used to generate the sister site." *Chrysler* at 21–24.

(1) The Parties' Positions

Plaintiff argues that "the 'used to generate' language is misleading and will confuse the jury" (Doc. No. 138 at 23). Plaintiff submits:

> Defendants may argue that the "used to generate" language means that the sister sites must be converted from the main sites. Stated differently, they will argue that the claims are limited such that the creation and maintenance of the sister site independently from the main site is outside the scope of the claims. But, the claims do not say anything about how the sister site is made, much less require that the general use web site generates the sister site. The claims recite only that a portion or a whole of the on-line content from a webpage is reformatted to generate a sister site, but are otherwise silent about the process used to format the content . . . .

(Doc. No. 138 at 23–24 (citing '196 Patent at 10:20–28)). Plaintiff further explains that "the specification describes a non-limiting embodiment where the sister site is created from the website. This non-limiting embodiment describes this conversion process as 'transcoding.' . . . [T]he claims of the '196 patent do not recite this feature" (Doc. No. 138 at 24 (citing '196 Patent at 3:21–37)). Plaintiff therefore maintains that "because the claim language already describes the relationship between the web page and sister site, no construction is required" (Doc. No. 138 at 23; *see also* Doc. No. 138 at 26).

Defendants respond that "[g]iven [Plaintiff's] unwillingness to agree that the web page referred to in this term is the same one that is used to generate the sister site, it is evident that this term needs to be construed in order to confirm its meaning for the jury" (Doc. No. 140 at 16). As to the proper construction:

> Defendants agree with the Court's construction of this term in the *Chrysler* case with one modification. To avoid confusion, the Court's construction should provide that "the web page," and not a "website," is used to generate the sister site. This is evident from viewing the claim language itself, which explicitly requires navigation to a "*web page*." (Emphasis added). [Plaintiff] selected the term "web page", so "web page" should be in the construction. *See Chef America v. Lamb-Weston*, 358 F.3d 1371, 1373 (Fed. Cir. 2004) ("courts may not redraft claims, whether to make them operable or to sustain their validity. . . . Even 'a nonsensical result does not require the court to redraft the claims . . . .'") [(quoting *Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999))].

(Doc. No. 140 at 16–17). Defendants then review the claim language, the specification, and the prosecution history and conclude that "[w]ithout question . . . the 'web page' referred to in this claim term is the very web page that was reformatted to generate the sister site" (Doc. No. 140 at 17).

Plaintiff replies that "[u]nder the guise of merely trying to set forth the antecedent basis for 'web page' in these phrases, Defendants propose to insert 'used to generate' language that is confusing and about which Defendants intend to argue always requires the machine conversion of the web page to create the sister site" (Doc. No. 142 at 5). Plaintiff argues that "[t]he claim language, however, makes clear that it is the *content* from a web page (not the web page itself) that is reformatted to generate a sister site" and that "the claims do not say anything about the process of making the sister sites" (Doc. No. 142 at 6).

Plaintiff also argues that the specification discloses multiple embodiments and in only one embodiment is the sister site "transcod[ed]" from the web site (Doc. No. 142 at 6). Plaintiff

submits that "the specification discloses embodiments showing the manual reformatting of sister sites and maintaining separate databases of sister site web pages corresponding to the standard webpages *as an alternative* to converting a desktop website to create a sister site on the fly" (Doc. No. 142 at 6 (citing '196 Patent at 2:56–59, Figs. 2B, 2C, 9A–D, 10a–g, 11, 12a–b, 13)). Plaintiff further argues that the construction should refer to "website" rather than "web page" because *Chrysler*, citing *Dr. Pepper*, properly found that a web site is something comprised of web pages (Doc. No. 142 at 7 (citing *Chrysler* at 9)).

Finally, Plaintiff argues that although it "contends that these ['to navigate . . .'] phrases do not need to be construed because their meanings are clear in the context of the claims and thus readily understood by a jury, to the extent that the Court determines that the language should be clarified, [Plaintiff] proposes the language 'that corresponds to' for 'used to generate' in the Court's constructions in order to avoid the confusion discussed above regarding how the sister site is generated" (Doc. No. 142 at 7–8 n.10).

(2) Analysis

Although Plaintiff proposes that no construction is required, the parties' briefing demonstrates a dispute that the Court has a duty to resolve. *See O2 Micro*, 521 F.3d at 1362.

Claim 58 is representative and recites (emphasis added; reexamination amendments included but not indicated):

58. A machine readable medium having instructions stored therein, which when executed cause a machine to perform a set of operations comprising:
displaying on-line content accessed via the Internet, *the on-line content reformatted from a webpage in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site, the sister site including a portion or a whole of content of the web page* reformatted to be displayed and navigable through a simplified navigation interface on any one of a television, web appliance, console device, handheld device, wireless device or cellular phone, the simplified navigation interface displayed in a form of a two-dimensional layer of cells from a plurality of layers and a plurality of cells, the

two-dimensional layer in a form of a navigation matrix, each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input, the on-line content formatted to be displayed in one or more of the plurality of cells and formatted to be selected for navigation by one or more of the unique inputs, navigation options to change between layers of the simplified navigation interface from general to more specific in each deeper layer;

     *displaying a hyperlink on the sister site to navigate to the web page*, or displaying a hyperlink on the web page to navigate to the sister site;

     receiving a user selection of one of the navigation options;

     forwarding the selected navigation option across the internet to a server providing the simplified navigation interface;

     receiving a next deeper navigation layer of the simplified navigation interface corresponding to the selected navigation option; and

     manipulating a region of the screen for viewing and zooming and/or scrolling of the displayed on-line content.

The claim itself thus recites that the sister site is generated from an HTML "web page." Further, the recital of "the web page" in the term "to navigate to the web page" refers to the same "webpage"[12] used to generate the sister site. *See, e.g., Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356–57 (Fed. Cir. 1999) ("It is clear from the language of the claim itself that the term 'a discharge rate' in clause [b] is referring to the same rate as the term 'the discharge rate' in clause [d]." (square brackets in original)); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1306 (Fed. Cir. 2005) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'") (quoting *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003)) (internal quotation marks omitted). The Court therefore hereby expressly rejects Plaintiff's argument that the sister site can be created "independently from the main site" as Plaintiff has suggested (*see* Doc. No. 138 at 23–24).

The proper construction of the term is thus evident from the face of the claim except that, as found in *Dr. Pepper*, the "sister site" is generated from a "web site," not strictly a particular

---

[12] The parties have treated "web page" and "webpage" as synonyms (*see* Doc. No. 149-2 at 2).

"web page." *See Dr. Pepper* at 6. Although Defendants argue that "[i]f the patentee had intended to refer to a 'website,' it could have done so" (Doc. No. 140 at 19), the context of the claims and the specification demonstrate that a sister *site*, which may include multiple pages, is generated from a corresponding web*site*, which may include one page or multiple pages as well. *Dr. Pepper* at 6 (citing '196 Patent at 2:52–54, 2:56–57); *see Phillips*, 415 F.3d at 1313 ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.). For example, the Brief Summary of the Invention in the '196 Patent states: "*Pages* from the sister *site* are served responsive to actuation of the sister site link." '196 Patent at 1:45–47 (emphasis added). Defendants' proposal to limit the sister site to being generated from a specific "web page" is therefore hereby expressly rejected.

The Court therefore hereby construes **"to navigate to the web page"** to mean **"to navigate to the website used to generate the sister site."**

## I. "to navigate to the sister site"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | "to navigate to the sister site generated from the web page" |

(Doc. No. 138 at 23; Doc. No. 140 at 20). The parties submit that this term appears in Claims 25 and 58.

*Chrysler* construed this disputed term to mean "to navigate to the sister site generated from the website." *Chrysler* at 24. Plaintiff argues this term together with the term "to navigate to the web page," discussed above (*see* Doc. No. 138 at 23–26; Doc. No. 142 at 5–7). Defendants argue the two terms separately but present substantially the same arguments, noting that "[t]he

parties' dispute on the term 'to navigate to the sister site' mirrors the dispute concerning the term 'to navigate to the web page'" (Doc. No. 140 at 20).

Although Plaintiff proposes that no construction is required, the parties' briefing demonstrates a dispute that the Court has a duty to resolve. *See O2 Micro*, 521 F.3d at 1362. Because the term "to navigate to the sister site" raises the same issues as the term "to navigate to the web page," discussed above, the Court reaches the same conclusions.

The Court accordingly hereby construes **"to navigate to the sister site"** to mean **"to navigate to the sister site generated from the website."**

**J. "to generate a sister site"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "to bring a web site in an XML format into existence by a machine reformatting the HTML format web page" |

(Doc. No. 138 at 26; Doc. No. 140 at 22). The parties submit that this term appears in Claims 25 and 58.

*Dr. Pepper* found no construction necessary for the larger term "the [first/online] content reformatted from a web page in a hypertext markup language (HTML) format into an extensible markup language (XML) format *to generate a sister site*." *Dr. Pepper* at 10–11 (emphasis added).

*Chrysler* construed "to generate a sister site" to mean "to bring a website in an XML format into existence by reformatting the HTML format website." *Chrysler* at 25–30.

<u>(1) The Parties' Positions</u>

Plaintiff "maintains that the claim phrase 'to generate a sister site' does not require construction because the claim language already describes the relationship between the desktop

website and sister site" (Doc. No. 138 at 26). Plaintiff also notes that *Chrysler* considered and expressly rejected Defendants' proposal of adding a "machine" limitation (Doc. No. 138 at 27). Plaintiff further argues that "[t]he '196 Patent specification does not use the words 'machine reformatting,' 'machine transcoder,' or 'machine,' so there is no support for inserting the requirement of a machine performing this operation. In addition, the jury would be confused about what these terms mean because the specification never uses the word 'machine' in connection with reformatting content" (Doc. No. 138 at 27). Plaintiff also reiterates its argument, discussed above as to the "to navigate . . ." terms, that "sister sites can be made manually and maintained separately from the desktop websites" (Doc. No. 138 at 27).

Defendants respond that "[t]he specification only teaches machine reformatting" (Doc. No. 140 at 22). Defendants argue that *Chrysler* erred by not requiring a "machine," and Defendants submit that "[w]hat was not previously before this Court, however, was that the inquiry of '. . . how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation'" (Doc. No. 140 at 23–24 (quoting *Phillips*, 415 F.3d at 1313)). Defendants urge that "even a person with only basic knowledge of computer science approaches computing problems attempting to find ways to not only solve the problem, but also solve the problem efficiently, using a computer" and "automated machine processes" (Doc. No. 140 at 24). Defendants conclude that "[a] person with even basic computer science knowledge would not understand the '196 Patent to encompass manual human processes intermixed between the automated machine processes expressly claimed" (Doc. No. 140 at 25).

Plaintiff replies by reiterating the *Chrysler* findings and by arguing that "the fact that a computer scientist may ask 'what can be efficiently automated?' does not change that the specification and claim language do not require machine automation" (Doc. No. 142 at 8).

Plaintiff also again submits the disclosure that: "Content partners may maintain a database of sister site web pages corresponding to the pages in the general use site. *Alternatively*, content partners may provide a facility for converting web pages on the fly to the sister site format" ('196 Patent at 2:56–59) (emphasis added).

        (2) Analysis

        Claim 58 is representative and recites, in relevant part (emphasis added; reexamination amendments included but not indicated):

> 58. A machine readable medium having instructions stored therein, which when executed cause a machine to perform a set of operations comprising:
>         *displaying on-line content accessed via the Internet, the on-line content reformatted from a webpage in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site, the sister site including a portion or a whole of content of the web page reformatted to be displayed and navigable through a simplified navigation interface on any one of a television, web appliance, console device, handheld device, wireless device or cellular phone,* the simplified navigation interface displayed in a form of a two-dimensional layer of cells from a plurality of layers and a plurality of cells, the two-dimensional layer in a form of a navigation matrix, each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input, the on-line content formatted to be displayed in one or more of the plurality of cells and formatted to be selected for navigation by one or more of the unique inputs, navigation options to change between layers of the simplified navigation interface from general to more specific in each deeper layer;
>         . . . .

The specification discloses:

> In one embodiment, the sister site is traditional HTML pages converted to a matrix format to permit matrix navigation. *This conversion may be done using an XML transcoding* or any other suitable language.

> Content partners may maintain a database of sister site web pages corresponding to the pages in the general use site. *Alternatively*, content partners may provide a facility for *converting web pages on the fly to the sister site format*.

'196 Patent at 2:52–59 (emphasis added). Defendants have also cited Figure 3, which illustrates "transcoder 30":

FIG. 3 is a flow diagram of conversion of standard HTML pages to a sister site format *in one embodiment* of the invention. *A hypertext markup language (HTML) page 40 is transcoded by a transcoder 30* to yield, for example, an XML page 42 to which a document type definition (DTD) 38 is applied. The DTD 38 specifies the rules for the structure of the resulting XML document. The XML page is then reformatted using extensible style language (XSL) 34 to corresponding format data 32. XSL is not currently supported by all standard browsers. Thus, after formatting, the XML document is translated to an extensible hypertext markup language (XHTML) document for subsequent display by a client side browser on display 52. Alternatively, the XML page may have a cascading style sheet (CSS) applied to achieve the desired format. One advantage of the CSS is that it is supported by standard browsers. After application of the CSS, the resulting formatted page can be displayed by the client browser on display 52.

*Id.* at 3:21–37 (emphasis added). Figure 3 is reproduced here:



FIG. 3

Defendants have relied upon Figure 3 as well as various disclosures that, Defendants argue, frame the claims in the context of machine-automated processes:

A person of ordinary skill in the art would understand the '196 Patent to mean that automated machine processes are performed to complete all the claimed steps of the patent. The '196 Patent is about simplification. '196 Patent at 2:26 ("A

simplified system for navigation…"). One embodiment provides: "[c]ontent partners may maintain a database of sister site web pages…" '196 Patent at 2:56–57. In this embodiment, many pages would have to be converted from full sites to sister sites at once. Such repetitive tasks would be simplified by efficiently automating the steps with a computer. Another embodiment envisions that "content partners may provide a facility for converting web pages on the fly…" '196 Patent at 2:58–59. In this embodiment, web pages would each be converted on-demand in the same instant the web pages are requested. The only way to convert web pages on-demand, in a simplified way, is through machine automation. In another embodiment, the patent discloses "providing for conversion on the client side." '196 Patent at 3:45–46. This embodiment is only possible using a machine automated process, as it is impossible for a content provider to manually convert a web page at a client's home.

(Doc. No. 140 at 24–25 (citations modified)). Defendants have also cited Figure 9a, which illustrates a matrix of an "amazon.com sister site" that includes a cell for "amazon.com," which Defendants argue is for navigating to the original HTML "web page" from which the sister site was generated (Doc. No. 140 at 18).

On one hand, the specification discusses conversion in the context of machine transcoding, as opposed to manual conversion by a person. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."); *see also Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1144–45 (Fed. Cir. 2005) (construing term "board" to mean "wood cut from a log" in light of the patentee's consistent usage of the term; noting that patentee "is not entitled to a claim construction divorced from the context of the written description and prosecution history"). Also, the Figures cited by Plaintiff, such as Figures 2B, 2C, 9A–D, 10a–g, 11, 12a–b, and 13 (*see* Doc. No. 138 at 27), illustrate sister sites but do not illustrate manual generation of a sister site.

On the other hand, the claims themselves only refer to "generat[ing]," not transcoding, and nothing in the specification disclaims using the content of a website to create a sister site manually rather than by machine. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("It is . . . not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer.").

On balance, Defendants' proposal would improperly import a limitation into the claims and is hereby expressly rejected. *See Innova/Pure Water*, 381 F.3d at 1117; *see also Phillips*, 415 F.3d at 1323.

Defendants have also noted that the preambles of Claims 25 and 58 recite operations performed by a machine (Doc. No. 140 at 25). Defendants have not briefed any issue of whether the preambles of Claims 25 and 58 are limitations of those claims. *See generally Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808–09 (Fed. Cir. 2002). Moreover, even assuming for the sake of argument that those preambles are limiting, there is no need to duplicate that limitation in the constructions of "to generate a sister site" and "reformatted." Moreover, as Plaintiff properly submits, "the claimed operations can be performed by a machine using a sister site that is manually created" (Doc. No. 142 at 9).

Finally, as discussed above regarding the term "to navigate to the web page," the sister site is generated from an HTML format "website" rather than strictly a single "web page." *See Dr. Pepper* at 6–7. The Court also hereby expressly rejects Plaintiff's argument that the sister site can be created "independently from the main site" as Plaintiff has suggested (*see* Doc. No. 138 at 23–24).

The Court accordingly hereby construes **"to generate a sister site"** to mean **"to bring a website in an XML format into existence by reformatting the HTML format website."**

K. "reformatted"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | "reformatted by a machine transcoder" |

(Doc. No. 138 at 26; Doc. No. 140 at 22). The parties submit that this term appears in Claims 25 and 58.

*Dr. Pepper* found no construction necessary for the larger term "the [first/online] content *reformatted* from a web page in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site." *Dr. Pepper* at 10–11 (emphasis added). *Chrysler* likewise found no construction necessary for the term "reformatted." *Chrysler* at 30–31.

Plaintiff and Defendants argue this disputed term together with the term "to generate a sister site" (*see* Doc. No. 138 at 26–28; Doc. No. 140 at 22–25; Doc. No. 142 at 7–9). Plaintiff submits specifically as to "reformatted," however, that "[b]ecause this term is used in its plain and ordinary sense, it should not be construed" (Doc. No. 138 at 28).

The parties' disputes having been fully addressed with reference to the term "to generate a sister site," above, Defendants' proposal of requiring a "machine transcoder" is hereby expressly rejected. The term "reformatted" requires no further construction. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not

be) required to construe every limitation present in a patent's asserted claims."); *Finjan*, 626

F.3d at 1207 ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district

court rejected Defendants' construction.").

The Court therefore hereby construes **"reformatted"** to have its **plain meaning**.

**L. "the two-dimensional layer in a form of a navigation matrix"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "the layer is at least two rows and at least two columns and is formed in a rectangular arrangement" |

(Doc. No. 138 at 28; Doc. No. 140 at 26). The parties submit that this term appears in Claims 25

and 58.

At the June 20, 2013 hearing in *Chrysler*, the Court provided the parties with the

following preliminary proposed construction: "the layer includes at least two rows and at least

two columns." *Chrysler* at 31. The defendants were agreeable, and Plaintiff responded that it

would be agreeable if the Court made clear that the rows and columns may be irregular. *Id.*

Plaintiff expressed concern that although the Court's preliminary proposed construction omitted

the "rectangular arrangement" phrase proposed by the defendants, the construction might

nonetheless be read to require a regular, uniform distribution of rows and columns. *Id.* Plaintiff

cited Figures 2C, 10f, 13, and 14 as illustrating irregular segmentation. *Id.* Plaintiff agreed,

however, that a single column would not qualify as "two-dimensional." *Id. Chrysler* then

construed the disputed term to mean "the layer includes at least two rows and at least two

columns." *Id.* at 32. The Court also expressly rejected the defendants' proposal of requiring a

"rectangular arrangement," and the Court further clarified that "the Court's construction allows

for 'irregular segmentation,' that is, non-uniform arrangement of rows and columns, and that cells may be of irregular size and shape." *Id.*

### (1) The Parties' Positions

In the above-captioned case, Plaintiff acknowledges *Chrysler* but nonetheless "maintains that this phrase does not require construction because the claim language will [be] readily understood by a jury without construction" (Doc. No. 138 at 28). Plaintiff also cites portions of the specification that Plaintiff characterizes as disclosing non-uniform, non-rectangular arrangements (Doc. No. 138 at 28–29) (citing '196 Patent at 2:63–65, 4:67–5:3, 8:51–53, 10:4–8, Figs. 2B, 2C, 8, 9a–d, 10a–g, 12a–b, 14).

Defendants respond that "[a] 'navigation matrix' is generally understood to refer to a rectangular arrangement, rather than some random arrangement of cells" (Doc. No. 140 at 26). Defendants also argue that "none of the[] statements in the patent [cited by Plaintiff] suggest, expressly or inherently, that the navigation matrix does not have a rectangular shape, overall" (Doc. No. 140 at 27).

Plaintiff replies that "[c]onstruing the term runs the risk that a jury will assume that every row has the same number of columns and every column has the same number of rows" (Doc. No. 142 at 9). Plaintiff further argues that the Court's clarification in *Chrysler* regarding "irregular segmentation" "would have to be given to the jury and even then it raises questions about what 'irregular segmentation' and 'non-uniform arrangement of rows and columns' mean" (Doc. No. 142 at 9).

### (2) Analysis

Because the parties' disagree on whether the disputed term requires a "rectangular arrangement," the Court is obligated to construe the term. *See O2 Micro*, 521 F.3d at 1362.

Claim 58 is representative and recites, in relevant part (emphasis added): "the simplified navigation interface displayed in a form of a *two-dimensional layer of cells* from a plurality of layers and a plurality of cells, *the two-dimensional layer in a form of a navigation matrix*, each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input . . . ."

As the parties agreed in *Chrysler*, the claimed "two-dimensional" matrix is something more than a single row or a single column. Defendants' proposal of at least two rows *and* at least two columns is appropriate because, for example, multiple "columns" arranged in a single, one-dimensional row would not be "two-dimensional."

As to whether a "rectangular arrangement" is required, Defendants argue that "every embodiment shown in the figures of the patent is a rectangular grid of cells, like a keypad" (Doc. No. 140 at 27) (citing '196 Patent at Figs. 2B, 5C, 8, 9a–9d, 10a–10g, 11, 12a–12b). Defendants emphasize that the '196 Patent, in particular in Figure 9b, "expressly teaches how to implement an irregular segmentation of cells within a rectangular matrix (note that the rightmost column has only two rows, while all other columns have four rows)" (Doc. No. 140 at 27). As to extrinsic evidence, Defendants have cited a dictionary definition of "matrix" that includes "something resembling a mathematical matrix esp[ecially] in rectangular arrangement of elements into rows and columns" *Merriam-Webster's Collegiate Dictionary* 717 (10th ed. 1996) (included with Defendants' briefing at Doc. No. 140-21).

In light of the disclosure of irregular segmentation. *See* '196 Patent at 1:58, 3:16, Fig. 2C; *see also id.* at 2:63–65, 8:51–53. and that cell boundaries might not be shown. *See id.* at 3:2–11, 4:67–5:3. The terms "two-dimensional" and "matrix" do not require a rectangular arrangement. On balance, Defendants' proposal of "a rectangular arrangement" would improperly import a

limitation into the claims and is hereby expressly rejected. *See Innova/Pure Water*, 381 F.3d at 1117; *see also Phillips*, 415 F.3d at 1323.

The Court further hereby clarifies that, as found in *Chrysler*, the Court's construction allows for "irregular segmentation" such that cells may be of irregular size and shape and may be in a non-uniform arrangement of rows and columns. *Chrysler* at 32.

The Court accordingly hereby construes **"the two-dimensional layer in a form of a navigation matrix"** to mean **"the layer includes at least two rows and at least two columns."**

## M. "manipulating a region of the screen" and "manipulating a selected region of the screen"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | "manipulating a cell" |

(Doc. No. 138 at 29; Doc. No. 140 at 28). The parties submit that this term appears in Claims 25 and 58.

*Dr. Pepper* previously found no construction necessary as to the larger term "manipulating a [region/selected region] of the screen for viewing and zooming and/or scrolling of the displayed on-line content." *Dr. Pepper* at 12–13. In *Chrysler*, the Court did not construe this term because "[d]efendants' response brief d[id] not address this term, and the parties did not address this term in their joint statement regarding the terms to be argued at the June 20, 2013 hearing" in *Chrysler. Chrysler* at 33.

### (1) The Parties' Positions

Plaintiff cites the *Dr. Pepper* analysis and, in particular, the finding in *Dr. Pepper* that "[t]he specification and claims . . . do not limit a region to only a portion of the screen" (Doc. No. 138 at 30) (citing *Dr. Pepper* at 13). Plaintiff further argues that "'[r]egion' and 'cell' are not used interchangeably in the claims or specification because they mean different things," and in

further support Plaintiff submits dictionary definitions of "region" and "cell" (Doc. No. 138 at 30).

Defendants respond that the disputed term itself, by referring to "a region *of the screen*," demonstrates that a region must be less than the whole web page (Doc. No. 140 at 28). Defendants explain that "[s]egmenting the display of a web page into a number of separate regions is a central aspect of the '196 Patent. This segmentation is what enables the so-called simplified navigation" (Doc. No. 140 at 28). Defendants also argue that "[t]he claims and specification use 'region' and 'cell' interchangeably to describe the separate portions of the so-called sister site" (Doc. No. 140 at 29). Finally, Defendants submit that in prior litigation, Plaintiff proposed giving "region" and "cell" the same construction, namely "an area" (Doc. No. 140 at 30).

Plaintiff replies by reiterating its opening arguments and by arguing that "[n]othing in the specification or intrinsic record compels a 'region of the screen' to mean 'cell.' Defendants' examples from the specification also actually reflect that 'cell' and 'region' are used differently" (Doc. No. 142 at 10). Plaintiff also notes that in the prior litigation cited by Defendants, Plaintiff "did not take the position that 'a region of the screen' means the same thing as 'cell'" (Doc. No. 142 at 10 n.13).

(2) Analysis

Claim 58 is representative and recites (emphasis added; reexamination amendments included but not indicated):

58. A machine readable medium having instructions stored therein, which when executed cause a machine to perform a set of operations comprising:
    displaying on-line content accessed via the Internet, the on-line content reformatted from a webpage in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site, the sister site including a portion or a whole of content of the web page reformatted to be

displayed and navigable through a simplified navigation interface on any one of a television, web appliance, console device, handheld device, wireless device or cellular phone, the simplified navigation interface displayed in a form of a two-dimensional layer of *cells* from a plurality of layers and a plurality of *cells*, the two-dimensional layer in a form of a navigation matrix, each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input, the on-line content formatted to be displayed in one or more of the plurality of *cells* and formatted to be selected for navigation by one or more of the unique inputs, navigation options to change between layers of the simplified navigation interface from general to more specific in each deeper layer;

  displaying a hyperlink on the sister site to navigate to the web page, or displaying a hyperlink on the web page to navigate to the sister site;

  receiving a user selection of one of the navigation options;

  forwarding the selected navigation option across the internet to a server providing the simplified navigation interface;

  receiving a next deeper navigation layer of the simplified navigation interface corresponding to the selected navigation option; and

  *manipulating a region of the screen for viewing and zooming and/or scrolling of the displayed on-line content.*

Because above-quoted Claim 58, for example, uses the term "cell" as well as the term "region," the Court presumes that those terms have different meanings. *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."); *accord Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("[T]he terms 'engaging' and 'sealing' are both expressly recited in the claim and therefore 'engaging' cannot mean the same thing as 'sealing'; if it did, one of the terms would be superfluous."); *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (noting "[t]he general presumption that different terms have different meanings").

Because this presumption is rebuttable, the Court turns to the evidence submitted by the parties. The specification suggests that a "cell" corresponds to a "region":

Content partners may also provide for segmentation of the base HTML web pages and/or the matrix pages. A segmentation may be performed in a number of ways.

> The page may be divided up based on content or area. The net result, in any case, is that the web page is divided into *regions* which are not necessarily, but may be, of equal size. The individual *regions* may be brought into focus independently. By "brought into focus," the concept of focus in this context is analogous to the front window in a windowing system. The focus *region* is deemed active and subject to client manipulation. In the context of a matrix page, one suitable segmentation is by *cell*, e.g., each *cell* corresponds to a *region* that may be independently brought into focus. The borders of the regions may or may not be visible on the web pages displayed. This segmentation facilitates tab, scroll, and zoom features described in more detail below.

'196 Patent at 2:59–3:8 (emphasis added).

> Particularly in the case of matrix pages, the different *cells* typically have associated therewith either an alphanumeric character or some symbol such as an asterisk or other punctuation mark to identify the *cell*. If there are identifications associated with the *regions*, a determination is made at decision block 456 if such an identification has been received as an input on the client node.

*Id.* at 5:13–19 (emphasis added).

> FIGS. 9a–d are example sister site *matrix* pages. In FIG. 9a, an advertising *cell* 900 is the focus *region* of the displayed image. Ten advertisements are displayed within the *regions*.

*Id.* at 8:18–20 (emphasis added).

During reexamination of the '196 Patent, Plaintiff stated that "[t]he '196 Patent specification discloses a process of re-presenting a web page via a sister site through a process of content *regionalization*. The '196 Patent discloses that individual content *regions* may then be brought into focus permitting simplified navigation . . ." (8/30/2010 Response, Doc. No. 140-13 at 7) (emphasis modified).

As to extrinsic evidence, Plaintiff has cited a "dictionary.com" definition of "region" as meaning "[a] large, usually continuous segment of a surface or space" (Doc. No. 138-7). Plaintiff has also cited a "dictionary.com" definition of "cell" as "any of various small compartments or bounded areas forming part of a whole" (Doc. No. 138-8).

Finally, in the prior cases of *EMG Technology, LLC v. Microsoft Corp., et al.* and *EMG Technology, LLC v. Apple Inc., et al.*, Plaintiff proposed that the plain meaning of both "region" and "cell" was apparent, but in the alternative, Plaintiff proposed that both terms should be given the same construction, namely "an area" (10/27/2010 P.R. 4-3 Joint Claim Construction and Prehearing Statement, No. 6:09-CV-367, Doc. No. 266 App'x A, Doc. No. 140-22 at 11). This prior litigation, however, was dismissed before the Court entered any claim construction order.

On balance, however, Defendants have failed to overcome the above-cited presumption that different terms have different meanings. In particular, Defendants have failed to demonstrate that manipulating a "region" must refer to manipulating a "cell" as opposed to, for example, manipulating a portion of the screen that includes multiple cells. Defendants' proposed construction is therefore hereby expressly rejected.

No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan*, 626 F.3d at 1207 ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

The Court therefore hereby construes **"manipulating a r egion of the screen"** and **"manipulating a selected region of the screen"** to have their **plain meaning**.

**N. "sister site"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a website that is related to another website" | "a site that provides for navigation of a related web page using a simplified navigation interface" |

(Doc. No. 113-2 at 1; Doc. No. 113-3 at 13). The parties submit that this term appears in Claims 25 and 58.

*Dr. Pepper* construed this term to mean "a website that is related to another website." *Dr. Pepper* at 5–7.

At the June 20, 2013 hearing in *Chrysler*, the Court provided the parties with the following preliminary proposed construction: "a site that provides for navigation of a related website using a simplified navigation interface." *Chrysler* at 10. Both sides were agreeable to the Court's preliminary proposed construction, which the Court therefore adopted. *Id.*

Defendants argue that for the same reasons discussed as to the terms "to navigate to the web page" and "to navigate to the sister site," above, the Court should construe "sister site" to mean "a site that provides for navigation of a related *web page* using a simplified navigation interface" (Doc. No. 140 at 30 (emphasis Defendants')). The Court hereby expressly rejects Defendants' proposal of "web page" for the same reasons as for the terms "to navigate to the web page" and "to navigate to the sister site," above.

The Court accordingly hereby construes **"sister site"** to mean **"a site that provides for navigation of a related website using a simplified navigation interface."**

**O. "webpage" and "web page"**

The parties note in their November 8, 2013 Joint Claim Construction Chart that they have reached agreement that **"webpage"** and **"web page"** should be construed to mean **"a document**

**on an Internet website"** (Doc. No. 149-2 at 2). The Court hereby adopts the parties' agreed construction.

## V. CONCLUSION

For the reasons stated, the Court adopts the constructions set forth above.

Within forty (40) days of the issuance of this Memorandum Opinion and Order, the parties are ORDERED, in good faith, to mediate this case with the mediator as agreed upon by the parties. Within five (5) days from this date, the parties shall meet and confer and then advise the Court of their agreed upon mediator or that they have not been able to agree upon a mediator. If the parties do not agree upon a mediator and the Court appoints a mediator, then the parties are ORDERED to mediate this case within forty (40) days of the appointment of a mediator by the Court.

**It is SO ORDERED**.

**SIGNED this 4th day of December, 2013.**

MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

# Attachment A

| Term | Court's Final Construction |
|---|---|
| 1. "manipulated within selected one of the regions" | Plain meaning |
| 2. "email form" | Plain meaning |
| 3. "purchasing interface" | "purchasing form displayed in the navigation matrix" |
| 4. "simplified navigation interface" | Plain meaning |
| 5. "next deeper navigation layer" | Plain meaning |
| 6. "exclusive to a separate single navigation option" | "there is a one-to-one relationship between cells and navigation options" |
| 7. "unique input" | "a distinct input that actuates only one navigation option" |
| 8. "to navigate to the web page" | "to navigate to the website used to generate the sister site" |
| 9. "to navigate to the sister site" | "to navigate to the sister site generated from the website" |
| 10. "to generate a sister site" | "to bring a website in an XML format into existence by reformatting the HTML format website." |
| 11. "reformatted" | Plain meaning |
| 12. "the two-dimensional layer in a form of a navigation matrix" | "the layer includes at least two rows and at least two columns" |
| 13. "manipulating a region of the screen" and "manipulating a selected region of the screen" | Plain meaning |
| 14. "sister site" | "a site that provides for navigation of a related website using a simplified navigation interface" |
| 15. "webpage" and "web page" | "a document on an Internet website" |